# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| HARTREE NATURAL GAS STORAGE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. N22C-07-073 PRW CCLD |
| PAA NATURAL GAS STORAGE, L.P., PLAINS ALL AMERICAN PIPELINE, L.P., | ) ) ) ) | |
| Defendants. | ) ) ) | |

Submitted: November 18, 2024
Decided: January 15, 2025

## DECISION AFTER TRIAL

Martin S. Lessner, Esquire, Timothy E. Lengkeek, Esquire, Mary F. Dugan, Esquire, Elisabeth S. Bradley, Esquire, M. Paige Valeski, Esquire, Alberto E. Chávez, Esquire, Kevin P. Rickert, Esquire, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Melvin A. Brosterman, Esquire, Patrick N. Petrocelli, Esquire, Daria D. Anichkova, Esquire, HOGAN LOVELLS US LLP, New York, New York, *Attorneys for Plaintiff Hartree Natural Gas Storage, LLC.*

Arthur G. Connelly, III, Esquire, Alan R. Silverstein, Esquire, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; John Zavitsanos, Esquire, Taylor Freeman, Esquire, Harrison Scheer, Esquire, Thomas Frashier, Esquire, Michael Gorrell, Esquire, Colin B. Phillips, Esquire, AHMAD, ZAVITSANOS, & MENSING, P.C., Houston, Texas, *Attorneys for Defendants PAA Natural Gas Storage, L.P., and Plains All American Pipeline, L.P.*

**WALLACE, J.**

In June 2021, Hartree Natural Gas Storage, LLC and PAA Natural Gas Storage L.P. ("PAA"), a subsidiary of Plains All American Pipeline, L.P. ("Plains"), entered into a Membership Interest Purchase Agreement (the MIPA). Per the MIPA, Hartree acquired two entities that owned and operated natural gas storage facilities located in Louisiana and Mississippi, along with their natural gas stores. The MIPA contained a "Gas in Place" representation for the exact amount of "base gas" contained in each of the facilities. Shortly after Hartree came into possession of the Pine Prairie, the Louisiana facility, it noted a significant discrepancy in its calculated "base gas" and the amount stated in the MIPA.

Hartree sued. And, at this point, there are two allegations of fraud—claiming that (1) the actual quantity of "base gas" at the Pine Prairie facility was approximately 40% less than represented in the MIPA, and (2) PAA falsely stated in the MIPA that it was in full regulatory compliance—that must be resolved by the Court. PAA and Plains have always maintained that they committed no fraud, that there was no missing gas when Pine Prairie was sold, and that Hartree suffered no damages. The Court held a nine-day trial at which a jury sat to determine Plains' liability and the Court sat to determine the claims between Hartree and PAA. The jury returned its binding verdict against Plains; this is the Court's against PAA.

# I. THE TRIAL

As just mentioned, in effect, two separate trials were conducted simultaneously, with one defendant's case heard and decided by a jury, and the other's heard and now being decided by the Court. This anomaly came about because MIPA Section 12(c)—which bound only Hartree and PAA—provided that disputes thereunder would be tried without a jury.[1] Plains, however, exercised its right to a jury trial on the claims Hartree leveled at it.[2] To ease trial presentation and avoid confusion, the Court had the jury unknowingly sit as just an advisory jury for the claims against PAA.[3]

During trial, the Court (and jury) heard the in-person testimony of:

| | |
|---|---|
| Scott Pruyn | Andre Aguillard |
| Benjamin Reese | John Wickens |
| Jeremy Goebel | Noel Longden |
| David Costello | Daniel Noack |
| Rajiv Madhavan | Dean Liollio |
| Jason Lemme | Harry Pefanis |
| Shane Randolph | |

---

[1]  Compl. Ex. A ("MIPA"), at § 12(c).

[2]  *See* 5/15/23 Mot. to Strike Jury Demand Hr'g. Tr. 40–48 (D.I. 107).

[3]  *See* Del. Super. Ct. Civ. 39(c); 9 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2335, at 353 (3d ed. 2008) (stating that the reason for using an advisory jury "often reflects the circumstances of the particular case or notions of efficiency or convenience") (hereinafter cited as "Fed. Prac. & Proc. Civ."). *See also Omega v. Deutsche Bank Trust Co. Americas*, 920 F. Supp. 2d 1298, 1300–01 (S.D. Fla. 2013) (approving, in a very like circumstance,  the use of a seated jury in such a dual role); *Cohen v. G & M Realty L.P.*, 320 F. Supp. 3d 421, 430–31 (E.D.N.Y. Feb. 12, 2018) (noting that "[t]o enhance the integrity of their verdicts, the Court decided it best to not tell the jurors that their findings would only be advisory.").

The parties presented video deposition testimony from Paul LaCour, Joshua Strickland, Charles Hoffman, and Scott Levy.[4]  The parties also submitted a little over 200 exhibits.[5]

During trial, Hartree moved for a mistrial.[6]  At the close of evidence, PAA and Plains moved for a directed verdict and judgment as a matter of law.[7]  The Court denied each of these at-trial applications.[8]

In the end, the jury found Plains: (1) liable for common law fraud but assessed damages of $0 therefor;[9] and (2) not liable for aiding and abetting fraud.[10]

The jury advised that PAA be found liable for fraud because of the representations made in MIPA Section and Schedule 4.20(a)—the absent gas allegation.  For that, it suggested a compensatory damage award of $55,084,290.[11]

---

[4]    *See* 5/7/24 AM Trial Transcript ("Trial Tr.") 39 (D.I. 315); *see generally* LaCour Dep.; 5/7/24 AM Trial Tr. 46; *see generally* Strickland Dep.; 5/8/24 AM Trial Tr. 103–04 (D.I. 301); *see generally* Hoffman Dep.; 5/16/24 Trial Tr. 116 (D.I. 311); *see generally* Levy Dep.

Court Trial Ex. 11 contains all of the trial depositions as presented by the parties at trial.

[5]    D.I. 276 (Hartree's Exhibit List); D.I. 277 (Defendants' Exhibit List).

[6]    5/13/24 AM Trial Tr. 4–15 (D.I. 284).

[7]    D.I. 270 (Defs.' Motion for Judgment as a Matter of Law); 5/15/24 PM Trial Tr. 214–38; 359–63 (D.I. 312).

[8]    5/13/24 AM Trial Tr. 15–20; 5/15/24 Trial Tr. 214–16, 228–30, 236–38, 359–63.

[9]    D.I. 274 (Jury Verdict Form 5–17–2024).  Hartree has a pending motion to "correct or amend" that verdict or alternatively to conduct a new damages–only trial against Plains.  D.I. 281, 286, and 290.

[10]   Jury Verdict Form § B.

[11]   *Id.* § A.

The jury also advised that PAA be found liable for fraud because of the representations made in Section 4.12 of the MIPA—the compliance with all applicable laws allegation. For this, though, the jury suggested an award of $0.[12]

Recall, the jury sat only in an advisory role for these latter claims against PAA. "In all actions not triable of right by a jury the Court . . . of its own initiative may try any issue with an advisory jury."[13] While little has been said in Delaware on the use of an advisory jury under our Civil Rule 39(c), Delaware courts commonly refer to "federal precedent interpreting analogue federal rules of civil procedure when speaking on our own."[14]

From all outward appearances, an advisory jury operates in the same way as any other petit jury—it hears the trial evidence, deliberates behind closed doors, and delivers findings of fact or a "verdict." But "the role of a jury so empaneled is, as the name would suggest, purely advisory in nature; the responsibility for the decision-rendering process remains with the trial judge and it is in the judge's discretion whether to accept or reject, in whole or in part, the verdict or findings of the advisory jury."[15] In other words, when engaged, "[a]n advisory jury does no

---

[12]  *Id.*

[13]  Del. Super. Ct. Civ. 39(c).

[14]  *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1028 (Del. Super. Ct. 2021) (collecting cases).

[15]  *United States v. Shields*, 649 F.3d 78, 84 n.5 (1st Cir. 2011) (quoting 9 Fed. Prac. & Proc. Civ. § 2335, at 354–56.) (cleaned up).

more that advise the judge; the ultimate responsibility for finding the facts remains with the court."[16] And that dichotomy abides through any findings and determinations on damages that might be required.[17]

With that backdrop, the Court now independently determines PAA's liability under Hartree's claims, and if any, the appropriate damages to be awarded to Hartree.[18]

## II. APPLICABLE LEGAL PRINCIPLES AND STANDARDS

Though the Court now sits alone, it has applied the same principles of law in its deliberations and consideration of this fraud claim that the jury was instructed to follow. The Court may in this writing highlight some of those most applicable to this particular case. But the fact that some particular point or concept may be

---

[16] *Frostie Co. v. Dr. Pepper Co.*, 361 F.2d 124, 126 (5th Cir. 1966).

[17] *See Ragin v. Harry Maklowe Real Estate Co.*, 6 F.3d 898, 907 (2d Cir. 1993) (explaining, when addressing a trial judge's award of less in compensatory damages than the advisory jury recommended: "[A district court] is not bound by the findings of the advisory jury, which it is free to adopt in whole or in part or to totally disregard[.]") (quoting *Sheila's Shine Prods., Inc. v. Shiela Shine, Inc.*, 486 F.2d 114, 122 (5th Cir 1973); *Colo v. NS Support, LLC*, 2023 WL 4034208, at \*16 (D. Idaho June 15, 2023) (noting court was "obligated" to make its own independent findings after submitting damage claims to advisory jury).

[18] *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1357 (Fed. Cir. 2012) ("[W]hen an 'advisory jury' is used, no jury findings—either explicit or implicit—are binding on the trial court and the court is obligated to make independent findings of fact and conclusions of law on the issue presented to the jury."); *DeFelice v. Am. Int'l Life Assurance Co. of New York*, 112 F.3d 61, 65 (2d Cir. 1997) ("[T]he court retains the ultimate responsibility for findings of fact and conclusions [of law] . . . in reliance upon the advisory jury's verdict if the court so chooses, and to explain how it arrived at those findings and conclusions.").

In addition to the trial evidence and arguments made by counsel that the Court and jury heard together, the Court also now has the benefit of the parties' post–trial briefing. D.I. 304–07.

mentioned here shouldn't be read as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and to the parties' claims and defenses.

In reaching its verdict, the Court has examined all exhibits submitted and considered the testimony of all witnesses, both direct and cross, live and by deposition. And, the Court now as sole finder of fact, has made its own assessment of each witness's credibility and reconciled, as best it could, any inconsistencies in the testimony and documentary evidence.[19]

The Court has also considered the applicable Delaware law that defines the legal precepts applicable to the claims and defenses the parties have forwarded. The Court has applied the Delaware Rules of Evidence to the testimony and exhibits presented at trial. Consistent with the Court's knowledge of those rules and the specific rulings that were articulated both pre-trial and during the trial proceedings, it only used evidence allowed under those rules and rulings for its deliberation. And, of course, the Court has considered each party's respective arguments, both oral and written, on the weight to be accorded to the testimony and evidence.

The Court then reviewed and applied the very instructions that it gave the

---

[19] *Pencader Assoc., LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *3 (Del. Super. Ct. June 30, 2010) ("[I]n a bench trial, it is the Court's role to resolve the conflicts in witnesses' testimony and weigh their credibility."); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545–46 (Del. Super. Ct. 2005) (setting forth "the customary Delaware standard" a trial judge applies when assessing trial testimony and evidence in a bench trial).

jury.[20]  Perhaps most importantly, the Court has held Hartree to its burden of proving each element of its claim—that PAA is liable for MIPA-defined fraud and resulting damages—by a preponderance of evidence.[21]

## III.  ANALYSIS AND FINDINGS

For certain actions at trial, it is difficult at times to completely segregate findings of fact from conclusions of law.[22]  So, to the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[23]

### A. PAA's Creation and Use of the HYSYS Model

PAA used two different models to determine and verify its gas inventory at Pine Prairie: NGI and HYSYS.[24]  The NGI model is the industry standard for monitoring gas storage facilities and makes energy estimates in million British thermal units (MMBtu).[25]  But PAA also developed its own tool, the HYSYS model,

---

[20]  *See* D.I. 320 (Jury Instructions).

[21]  *See generally Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, 2024 WL 1596021, at *15 n.201 (Del. Super. Ct. Apr. 12, 2024) (defining burden of proof in trial of fraud claims) (collecting cases); *see also Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence: "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists.").

[22]  *Intermec IP Corp. v. TransCore, LP*, 2023 WL 5661585, at *2 (Del. Super. Ct. Aug. 23, 2023).

[23]  *Id.* (citing *Facchina Constr. Litigations*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020), judgment entered *sub nom. Facchina Const. Litigations* (Del. Super. Ct. 2020) (collecting authority)).

[24]  *See*, *e.g.*, Aguillard Dep. 264.

[25]  *See* 5/13/24 AM Trial Tr. 27.

to measure geometric gas volume in billion cubic feet (BCF), and used it—at least, in part—for inventory verification.[26] PAA began using HYSYS in 2017 and continued its use until at least 2021.[27]

The HYSYS model was used primarily to evaluate risk scenarios and determine Pine Prairie's injection capabilities.[28] Prior to this litigation, PAA's stance was that HYSYS was a reliable alternative to the NGI model for measuring in MMBtu because there was a "correlation between the simulations and . . . pressures[] . . . temperatures, and cavern inventory."[29] But at least one of its developers disclaimed its usefulness at trial, saying that he wouldn't recommend that anyone use the HYSYS model to calculate total cavern inventory.[30]

At bottom, the dispute here is focused on PAA's decision to use its NGI calculations without regard to its own generated HYSYS calculations and its failure to disclose—if not actively withhold—significant known discrepancies between the two before, during, and even after the sale of Pine Prairie to Hartree.

---

[26] *See* Aguillar Dep. 264; 5/14/24 AM Trial Tr. 89 (D.I. 318); *see also* 5/15/24 Trial Tr. 305. 1,000,000 MMBtu equals 1 Bcf. *What is a Bcf of Natural Gas?*, UTILITYSMARTS, https://www.utilitysmarts.com/gas/natural–gas/what–is–a–bcf–of–natural–gas/ (last visited Dec. 9, 2024).

[27] 5/15/24 Trial Tr. 242, 247, 281–82.

[28] *See generally* DX1564 (Email from D. Noack to C. Chandler re: PPEC Inventory Analysis).

[29] PX164, at 29.

[30] 5/15/24 Trial Tr. 298.

## B. PAA REALIZES THE DISCREPANCY BETWEEN NGI AND HYSYS CALCULATIONS

PAA first noticed a discrepancy between its HYSYS and NGI calculations in 2018, about three years prior to the MIPA.[31] Mr. Pruyn, a PAA employee, confirmed the discrepancy between the two models and that PAA was aware of the discrepancy at the time of the MIPA.[32] Such a discrepancy could indicate a variety of issues such as missing gas, a leak, or a faulty meter or monitor.[33] Despite being aware of those potentials, PAA failed to conduct a proper investigation into the source of the discrepancy.[34] Mr. Pruyn explained that it was PAA's intention to "kick the can"

---

[31] *See* Email from D. Noack to C. Chandler re: PPEC Inventory Analysis, at 3.

[32] *Compare* 5/6/24 PM Trial Tr. 74 (D.I. 314):

    A. Yes, sir. There was a discrepancy, yes, sir.

    Q. Okay. And it was a pretty significant amount of gas discrepancy. Right?

    A. It was a difference, yes, sir.

    Q. A significant difference. Correct?

    A. Yes, sir.

    Q. Millions and millions of units of gas. Right?

    A. The models were different, yes, sir.

    Q. Four to six million units of gas difference. Right?

    A. Yes, sir.

W*ith* Strickland Dep. 249 (testifying that no one was aware of any meter issues before Hartree's after–acquisition testing).

Mr. Reese, PAA's Senior Vice–President of Commercial Activities, also acknowledged that there was a discrepancy at the time of Pine Prairie's sale. 5/8/24 AM Trial Tr. 87.

[33] *See* Strickland Dep. 149–50, 153–55; *see also* PX171 (Email to D. Noack to J. Goebel et al. re: PNG Inventory Verification).

[34] *See* 5/14/24 PM Trial Tr. 19–21.

until the sale of Pine Prairie by adding additional base gas to its reserves to match the deal calculations and normalize levels before the closing of the deal.[35]

## C. THE PARTIES' MEMBERSHIP INTEREST PURCHASE AGREEMENT

PAA and Hartree executed the MIPA in June 2021 and amended it the following month.[36] Through the MIPA, Hartree purchased two facilities for the base purchase price of $850 million.[37] The "Allocation of Purchase Price" clause provided for an adjustment to the final purchase price based on the price of gas on a date agreed to by the parties prior to closing.[38] The parties agreed to a "base gas" price of $2.90 per MMBtu.[39]

For the Pine Prairie facility, the MIPA's final "base gas" estimate in the attached schedule was 18,776,916 MMBtu, as represented by PAA in the body of the MIPA:[40]

---

[35] 5/6/24 PM Trial Tr. 99–101; *see* 5/7/24 AM Trial Tr. 18–21.

    Q. So the gas that was being delivered into the facility was being delivered into the facility after the date of the agreement that was signed; correct?

    A. Yes, sir.

    Q. And on the date that the agreement was signed, the gas that was supposed to be flowing in on June 8th, June 9th, June 10th, June 11th, so on and so forth through June, was not physically in the caverns at that point in time; correct?

    A. Correct.

[36] Complaint ("Compl.") ¶ 1 (D.I. 1, 7).

[37] MIPA, at § 2.2 (emphasis added).

[38] MIPA Ex. E.

[39] DX1694A, at 1 (Email from S. Levy re: Plains Debt Financing Update).

[40] MIPA, at Schedule 4.20(a) (Schedule representing "Gas in Place — Pine Prairie") (emphasis

**Gas in Place.** (a) Pine Prairie has (and at the Closing will have) *physical possession and custody of* a quantity of natural gas in the Pine Prairie Facility (in each case measured in MMBtu) at *least equal to (i) 18,759,416 MMBtu of Base Gas . . . .* To Seller's Knowledge, Schedule 4.20(a) of the Seller Disclosure Schedules contain an accurate and complete list (broken down by categories (i)-(v) above and, in the case of categories (ii), (iv) and (v), also by agreement and quantity) of the inventory of natural gas in the Pine Prairie Facility *from the NGI inventory tracking system* as of 9:00 a.m., Louisiana time, on the June 7, 2021 flow day.[41]

These base gas representations in the MIPA were important to Hartree in finalizing the deal.[42] Post-acquisition, Hartree would discover that HYSYS was likely the more accurate model of real inventory for Pine Prairie at the time of the deal—a fact conveniently minimized, if not, wholly left out, of deal discussions.[43]

The MIPA also contained PAA's representation that the facilities and relevant

---

added).

[41] *Id.* § 4.20(a) (emphasis added). "NGI" stands for natural gas inventory. *See* 5/6/24 Trial Tr. 87. For the MIPA, the parties used an NGI inventory tracking system that relied on meters in the facility that measured incoming and outgoing gas. DX1674, at 5.

[42] 5/14/24 AM Trial Tr. 83–84.

> Q. Was that representation important to you, and did you rely on it in connection with the recommendation that you made that these facilities be purchased by Hartree?
>
> A. Absolutely, yes.
>
> Q. Can you explain why?
>
> A. Because base gas is a critical component to a facility, it's considered like a fixed asset like your pipeline or your compressor, but it's something that throughout the diligence process, we couldn't go down and see, right? And so one way to get comfortable with the deal was to have them make us this representation, which is effectively a promise that's formalized in a legal document. And so they promised us that there was this much base gas in this ground physically, and so that made us comfortable with it. We were absolutely relying on this language.

[43] 5/8/24 PM Trial Tr. 66–67, 73; 5/13/24 PM Trial Tr. 22–27, 31–34.

- 11 -

government filings were in material compliance with applicable laws:

> [t]o Seller's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time, or both) would reasonably be expected to constitute or result in a violation by a member of the Company Group of, or a failure on the part of a member of the Company Group to comply with, in all material respects, all applicable Laws."[44]

The MIPA defined fraud as "an actual, knowing and intentional fraud with respect to the making of the representations and warranties."[45] And as relevant here, MIPA-defined fraud requires,

> (a) actual knowledge (as opposed to imputed or constructive knowledge) (x) on the Execution Date that such representations and warranties were actually and materially breached . . . (b) the express intention that the other Party would rely on such breached representations and warranties to its detriment and (c) the actual intent to deceive the other Party and to receive a material benefit from such deception.[46]

The deal closed and Pine Prairie was transferred on August 1, 2021.[47]

### D. PAA'S LACK OF DISCLOSURE

At the time of the MIPA, PAA knew that at least 4 to 6 BCFs of gas weren't physically present at Pine Prairie.[48] It chose not to disclose or adequately investigate

---

[44] MIPA, at § 4.12.

[45] MIPA Ex. A, at A–4 (MIPA definition of "Fraud").

[46] *Id.*

[47] 5/16/24 Trial Tr. 35–36.

[48] PX32, at 2–5; PX36.

the issue and instead concealed it from Hartree with a temporary band-aid.[49]  Even knowing the issue, PAA still chose the significantly inflated NGI calculations for the representations and terms of the MIPA, without accounting for the HYSYS calculations and the, by then, well-known discrepancy.[50]  And PAA never informed Hartree of that discrepancy and never disclosed any actual HYSYS calculation outputs to Hartree until well after the deal closed.[51]

No one at Hartree was aware of the discrepancy in calculations or the absent gas before the sale closed.[52]  According to one deal advisor, PAA intentionally withheld the discrepancy between the NGI and HYSYS calculations.[53]

---

[49]  *Id.* PAA had used "parking" as another temporary measure to account for the noted inventory discrepancy.  Strickland Dep. 15, 29, 97–99; PX18, at 3 (identifying "potential meter error" as a source of the NGI–HYSYS discrepancy and decision to "Park ~ 3Bcf to Oct 2020").

[50]  *See* 5/8/24 PM Trial Tr. 66–67 (D.I. 292); 5/15/24 Trial Tr. 22–23; Strickland Dep. 249 (testifying that the MIPA was based on NGI calculations, not HYSYS).

[51]  5/8/24 AM Trial Tr. 84, 145; 5/9/24 Trial Tr. 152–53 (D.I. 289); 5/14/24 AM Trial Tr. 111–12, 125–26 (D.I. 293); PX231; 5/8/24 AM Trial Tr. 129.

> Q.  Actually, sir, do you recall, sir, that that data was not provided until after the closing?
>
> A.  NGI data?
>
> Q.  No, sir. The HYSYS data was not provided until after the closing. Correct?
>
> A.  I believe the inputs were provided in the data room in the spreadsheet.
>
> Q.  But the outputs were not?
>
> A.   No, sir.

[52]  5/14/24 AM Trial Tr. 97, 100–01.

[53]  5/8/24 AM Trial Tr. 135.

> Q.  Okay. Sir, to be clear, the decision not to tell Hartree about HYSYS was not a mistake. It was purposeful. Right?
>
> A.  It was unnecessary. We only give accurate information to the buyers. We don't give any inaccurate information to buyers.

PAA claimed both before and after the transaction—as well as during this litigation—that it did not disclose HYSYS raw calculations, past data, and model assumptions to Hartree because that information was "proprietary."[54] Even post-closing, PAA still refused to hand over the model and this damning information protesting that "[g]iven the nature of the assumptions and judgments made to create the inventory verification model, the fully built out model and any reports produced therefrom are Plains' intellectual property and are not books and records."[55] That reasoning was pretextual and further evidence of PAA's knowledge of the falsity of its "gas in place"/"physical possession and custody" representation.

## E. THE MISSING GAS-IN-PLACE

At bottom, PAA admits that it was aware of the discrepancy,[56] but insists that there was no gas missing.[57]

Once Hartree took possession of Pine Prairie and was granted access to the

---

Q.  But the decision not to tell Hartree that there were two different numbers in two different measurement systems — okay — was purposeful, not a mistake. Correct?

A.  Yes, sir.

PAA maintains its insistence that the HYSYS model and calculations were inaccurate. *See*, *e.g.*, 5/8/24 AM Trial Tr. 143–45.

[54]  *See*, *e.g.*, 5/14/24 AM Trial Tr. 115–17.

[55]  PX235.

[56]  *See* 5/16/24 Trial Tr. 151.

[57]  *Id*. at 117, 139 (if there had been, PAA says, it "would have purchased the gas, replaced it, put in the facility"). Indeed, it had done so before during certain deal-relevant times without notifying Hartree. *See* PX36; 5/6/24 PM Trial Tr. 99–101; *see also* 5/7/24 AM Trial Tr. 18–21.

before undisclosed HYSYS data, it quickly discovered the problem.[58] And the NGI-HYSYS discrepancy—a 7 Bcf difference—was so significant it triggered an investigation to verify the physical volume of gas present at Pine Prairie.[59]

Hartree enlisted two experts: John Wickens and David Costello. Mr. Wickens, Hartree's expert in underground storage, independently calculated the volume of gas in the caverns.[60] He confirmed that indeed there a significant gas inventory loss/discrepancy.[61] Hartree also hired Mr. Costello, a mechanical engineer, to investigate the discrepancy in base gas.[62] He discovered that one of the meters that the NGI calculations relied on had a "disproportionately high error rate," which was present before the transfer of Pine Prairie.[63] Since at least one meter over-reported

[58] *See* 5/14/24 Trial Tr. 126.

[59] 5/9/24 Trial Tr. 145–46.

> Q: Mr. Madhavan, would you consider a 7 Bcf discrepancy between gas accounting method and physical parameter method to be — to qualify as a significant variance?
>
> A: Yes, definitely 100 percent.
>
> Q And would you expect it to be investigated?
>
> A: Yes, a 100 percent.
>
> Q: Why is that?
>
> A: It's — you have to physically know how much is in the these at this facility rather than just depending on a software that's just using what is being said is on the books. At the end of the day, that should verify to physically to what is in the ground. And for that, you have to conduct tests, you have to use modeling, to make sure that these two verify. And that has to be done routinely, and we do it at all the facilities, so.

[60] 5/13/24 PM Trial Tr. 22–27, 31–34.

[61] *Id.* at 31–34.

[62] 5/8/24 PM Trial Tr. 46–49.

[63] *Id.* at 64–65; 5/9/24 Trial Tr. 68–69.

gas flow into Pine Prairie, all prior NGI calculations were artificially inflated, which means that the NGI representations in the MIPA were not accurate.[64] The investigation confirmed that Pine Prairie was missing gas at the time of closing and that the HYSYS model, being unaffected by the meter error, seemed to accurately estimate gas inventory—*i.e.* in MIPA terms the actual "quantity of natural gas" in "physical possession and custody of" the Pine Prairie Facility—at the points of time at issue.[65]

Essentially, this all means that Hartree paid for up to 7+ Bcfs of gas that it didn't receive at closing.[66] And before any replacement gas was purchased, Hartree spent $1,198,004 in order to stabilize cavern volume as the issue was investigated.[67] Then, much later, Hartree endeavored to replace the missing gas. It says it paid its parent company $55,084,290 to replace the gas missing gas; an expenditure it now posits was necessary.[68] In Hartree's view, the lower gas volume was once again

---

A:   Because the question because—the question as it was presented to me was is gas missing or not, and was it fairly obvious that gas was missing. And I think the answer is yes, all the way back into 2018. Separately, there is no evidence that I saw that the meter error only arose in 2021, 2022. There is reason to believe, from my opinion, that meter error started earlier.

[64]   5/8/24 PM Trial Tr. 66–67, 73.

[65]   *See* 5/9/24 Trial Tr. 122–23.

[66]   5/14/24 PM Trial Tr. 8–9.

[67]   Ct. Ex. 3, at 1; 5/15/24 Trial Tr. 165; 5/16/24 Trial Tr. 276 (requesting $56,282,294 in damages at closing which equal $55,084,290 on replacement gas plus $1,198,004 on replacement water).

[68]   *See* DX2031 (RWI Deals); *see also* 5/10/25 Trial Tr. 264–65; 5/13/24 AM Trial Tr. 26; (opining that Hartree's methods for buying replacement gas were reasonable and complied with

confirmed when Hartree eventually injected the replacement gas into the caverns without incident.[69]

## F. HARTREE'S ALLEGATIONS

Hartree alleges that PAA committed fraud by: (1) knowing and concealing that more than 7.295 Bcfs of base gas was missing on the closing date and date of transfer; (2) using NGI—with no regard for the HYSYS discrepancy—to make its representations in the MIPA knowing that the NGI calculations materially overstated the gas amount in Pine Prairie; and (3) submitting regulatory reports calculated using NGI, without proper disclosure of HYSYS calculations, knowing that the NGI calculations materially overstated the gas amounts.[70]

Hartree claims that such a discrepancy would have required additional investigation for Hartree to be comfortable with the MIPA, and it would not have agreed to basing the representations in the MIPA on the NGI calculations if it had known about the discrepancy.[71] At the time of negotiations, Hartree had no reason to disbelieve PAA's representations and relied on the data it supplied.[72] In fact, "[Hartree] relied on the representation of physical gas in the ground. [Hartree] relied

---

industry standard).

[69] 5/9/24 Trial Tr. 184–85 (explaining such a significant injection would have had "catastrophic" results had the gas truly not been missing).

[70] Hartree's Post–Trial Opening Br. 32–45 (D.I. 304).

[71] *See* 5/9/24 Trial Tr. 153–54, 200–03.

[72] *Id.* at 154–55.

on the fact that they were in compliance with all laws. [Hartree] relied on the fact that in [its] diligence process, [Hartree] had conversations with [PAA] and they indicated that they were performing inventory."[73] According to Hartree's CEO and leader of the due diligence team:

> There is no way that my team and I would have recommended this deal if we knew there was a 7 BCF discrepancy. And not just because it would have been 7 BCF less gas, but because it demonstrates so many red flags about what could have happened.[74]

Some of these red flags would have included not being able to meet customer commitments, issues with the integrity of the facility or the caverns, and environmental issues.[75]

PAA also represented that it was in full regulatory compliance.[76] But Hartree claims that PAA's regulatory filings were fraudulent because they knowingly relied upon inaccurate NGI calculations and never disclosed the accurate HYSYS-derived MMBtu calculations.[77] Yet, Hartree requested no damages for the alleged misrepresentation on the regulatory-violations and presented no evidence at trial as to any damages suffered due to PAA's regulatory non-compliance.[78]

---

[73] 5/14/24 AM Trial Tr. 69–70.

[74] *Id.* at 85.

[75] *See id.* at 104–05.

[76] MIPA, at § 4.12.

[77] *See* Hartree's Post–Trial Opening Br. 43–45.

[78] *See id.* at 47–50.

## IV. HARTREE'S REMAINING FRAUD COUNT

Hartree brought one count of fraud against PAA for the alleged false representations.[79]   Again, following the jury instructions that both parties agreed were consistent with the MIPA, Hartree had the burden of proving by a preponderance of the evidence that:

(1)  PAA Natural Gas had actual knowledge that, on the MIPA Execution Date, a representation or warranty was actually and materially breached; *AND*

(2)  PAA Natural Gas had the express intention that Hartree Natural Gas would rely on such breached representation or warranty to its detriment; *AND*

(3)  PAA Natural Gas had the actual intent to deceive Hartree Natural Gas; *AND*,

(4)  PAA Natural Gas had the actual intent to receive a material benefit from such deception.[80]

Notably, the MIPA's fraud provision does not completely align with Delaware's common law fraud elements; for instance, MIPA-based fraud requires actual knowledge of falsity.[81]   Hartree has carried the necessary burden as to one of its

---

[79]   MIPA, at §§ 4.20, 4.12.

[80]   Tr. Jury Instr. 10–11 (Fraud as Alleged Against PAA Natural Gas Storage); 5/16/24 Trial Tr. 228–29.

[81]   The Court must follow the language of the contract which is different from common law because the contract expressly excludes fraud based on imputed or constructive knowledge. *Compare* MIPA Ex. A (defining fraud in the Agreement as "an actual, knowing and intentional fraud with respect to the making of the representations and warranties"), *and* Tr. Jury Instr. 10–11 (instructing that for Count 1 against PAA it must be proven that "PAA Natural Gas had actual knowledge"), *with Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021) ("To state a claim for [common–law] fraud, a plaintiff must allege: (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was

fraud allegations, but not the other.

### A. PAA IS LIABLE FOR FRAUD UNDER SECTION 4.20.

This case deals with fraud in a representation and warranty, not its more common counterpart, fraud in the inducement.[82] So, the Court does not look to whether Hartree would have signed had it known about the discrepancy. Rather, in this specific instance, the Court looks to whether the amount of "gas in place"

---

recklessly indifferent to its truth; . . ."), *and* Tr. Jury Instr. 12–13 (instructing that for Count 2 against Plains it need only be proven that "Plains Pipeline knew or believed that the representation was false, or was made with reckless indifference to the truth, or that the omission of fact would lead to a false impression . . .").

[82] Section 4.20(a) contains two distinct representations: (1) "Pine Prairie has (and at the Closing will have) physical possession and custody . . . at least equal to (i) 18,759,416 MMBtu of Base Gas," and; (2) "[t]o Seller's Knowledge, Schedule 4.20(a) of the Seller Disclosure Schedules contain an accurate and complete list . . . of the inventory of natural gas in the Pine Prairie Facility from the NGI inventory tracking system. . . ." MIPA, at § 4.20(a) (emphasis added).

It is the first of the representation that lies at heart of the dispute here. PAA states of the measurement of gas it has or will have in MMBtu without clarifying whether the NGI or HYSYS model was used to derive that number. Hartree insists that PAA should have used the HYSYS model to calculate "base gas" because only the section's second portion specifically states that it will use NGI, and PAA historically measured its physical inventory using HYSYS. *See*, *e.g.*, Email to D. Noack to J. Goebel et al. re: PNG Inventory Verification. So, says Hartree, since NGI wasn't identified as the means of calculation and § 4.20(a)(1) deals with actual physical possession, the Court should interpret § 4.20(a)(1) to require use of the HYSYS model number. Contrarily, PAA insists that the use of the NGI model is the only reasonable interpretation "because NGI was the only system capable of calculating the total <u>energy content</u> (MMBtu) within the Pine Prairie facility." PAA Post-Trial Opening Br. 13 (D.I. 305).

The Court need not settle this quibble on interpretation. The issue is resolved by the Court's finding that PAA knew its NGI numbers were unreliable. One can't know that the metering is off (and has been for quite some time), not disclose that fact, and then use those meter-borne numbers in a contractual representation like this.

To demonstrate with perhaps an overly simplistic example: it would be like the seller of a used car suggesting that it was okay that he knew—and actively concealed—that the odometer hadn't been properly registering for years as long as he could get the buyer to sign off on that mileage in the pink slip.

- 20 -

promised and paid for was actually delivered; and if not, whether PAA knew it was not. In situations such as this, the plaintiff need only prove their reliance on a certain representation for a certain price.[83] Here, Hartree relied on PAA's representation in the MIPA that Hartree would receive *at least* 18,759,416 MMBtu of Base Gas.[84] But given the evidence presented, the Court finds Hartree received less than what PAA represented.[85]

Remember, in this instance, the fraud must also be committed knowingly. That means Hartree, as plaintiff, must prove that PAA "had knowledge of the falsity" of its MIPA representation at issue.[86] The Court finds that PAA had such knowledge.

Simply put, Hartree met its burden of proving that it paid for *at least* 18,759,416 MMBtu of Base Gas that was not fully delivered after PAA knowingly misrepresented the "Gas in Place" at the Pine Prairie facility in MIPA Section 4.20

---

[83] *Cf. Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *30 (Del. Ch. Mar. 9, 2022), reargument granted, 2022 WL 973441 (Del. Ch. Mar. 31, 2022) ("Having contractually promised [the buyer] that it could rely on certain representations, [the seller] is in no position to contend that [the buyer] was unreasonable in relying on [the seller's] own binding words.") (internal citations omitted).

In this case, the MIPA has been signed and the representations made within the MIPA are contractual.

[84] MIPA, at § 4.20(a) and Schedule 4.20(a).

[85] 5/13/24 AM Trial Tr. 27; 5/14/24 PM Trial Tr. 37–38.

[86] MIPA Ex. A.

and Schedule 4.20(a).[87]

### 1. Hartree has proven PAA's actual knowledge.

Fraud occurs when one provides inaccurate information for another party to rely upon.[88] Fraud also includes a failure to disclose additional necessary information to prevent the representation from being misleading.[89] Aside from Delaware common law requirements, the MIPA further requires that actionable fraud thereunder must be committed knowingly.[90]

Here, PAA had actual knowledge that, on the MIPA execution date of June 7, and the transfer date of August 1, 2021, its base gas representation wasn't accurate because Pine Prairie could not adequately account for a significant volume (whether

---

[87] Again, as to each element underlying this finding, Hartree had to prove its existence was "more likely than not." *See* Tr. Jury Instr. 9 (Burden of Proof by a Preponderance of the Evidence); *Surf's Up*, 2024 WL 1596021, at \*15 n.201 (defining burden of proof in trial of fraud claims); *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at \*17 (Del. Ch. Sept. 10, 2018) (same).

[88] *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983) ("But fraud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading."); *see also Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at \*26 (Del. Ch. Apr. 3, 2020), judgment entered, (Del. Ch. 2020), judgment entered, (Del. Ch. 2021) ("The first element of fraud, a "false representation," can take several forms: it may be an "overt misrepresentation" (i.e. a lie), a "deliberate concealment of material facts," or else "silence in the face of a duty to speak.") (internal citations omitted).

[89] RESTATEMENT (SECOND) OF TORTS § 551(2)(b) cmt. g (AM. L. INST. 1977); *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773–74 (Del. Ch. 2014) (citation omitted) ("fraud also may occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.").

[90] MIPA Ex. A.

it be expressed in MMBtu or Bcf) of Base Gas.[91] PAA's actions demonstrate that this indeed was more likely than not.[92]

PAA had a duty to ensure its "Gas in Place" representations were accurate and its failure to disclose the discrepancy—and even actively conceal it—is telling evidence that it knew it wasn't.[93] The HYSYS data was "qualifying information to cure the mistaken belief"[94] the representation engendered. Yet, PAA took no corrective action and refused to disclose—what it labeled "proprietary"—the prior HYSYS model outputs and calculations.[95] In this instance, through PAA's failure to disclose the ongoing discrepancies and its own pre-closing supplemental gas deposits, Hartree demonstrated that PAA had actual knowledge of the material breach of the Section and Schedule 4.20(a) "Gas in Place" representation or warranty.

Accordingly, this Court finds that PAA had actual knowledge that the MIPA contained a material misrepresentation.

---

[91] PX32, at 2–5 (Email string ending with email from B. Reese to T. Rimbey re: FW: Materials for tomorrows meeting); PX36 (Email from D. Noack to E. McKee re: Re: PPEC).

[92] *E.g.* PX36 (Email from D. Noack to E. McKee re: Re: PPEC); PX164, at 27–33; 5/6/24 PM Trial Tr. 73–74; *see also* PX18, at 3.

[93] *See NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *13 (Del. Ch. Aug. 2, 2023) (stating "an incomplete statement" can be fraud when a defendant does not disclose matters necessary to avoid misleading a plaintiff).

[94] *Columbus Life Ins., Co. v. Wilmington Tr. Co.*, 2023 WL 1956868, at *8 (Del. Super. Ct. Feb. 13, 2023) (citing *Norton v. Poplos*, 443 A.2d 1, 5 (Del. 1982)).

[95] *See*, *e.g.*, 5/14/24 AM Trial Tr. 115–17.

## 2. Hartree has proven PAA had the express intent that Hartree would rely on its base-gas representation *and* the actual intent to deceive.[96]

PAA's shifting position and reliance on the HYSYS model is persuasive proof of its intent for Hartree to rely on inaccurate information and to actually deceive Hartree. Even when aware of the Bcf discrepancy, PAA continued to actually rely on its HYSYS calculations in its own day-to-day operations, but then acted as though the HYSYS model and its calculations were insignificant for purposes of the MIPA.[97] In the MIPA, PAA used NGI for the "Gas in Place" representation.[98] It knew NGI would reflect a significantly higher "base gas" estimate and, ultimately, lead to a higher deal price.[99] At the same time, however, the credible evidence demonstrates that it knew the HYSYS estimates indicated a problem with the facility (and more specifically the validity of the NGI numbers) that could have jeopardized the entire deal.[100] PAA's historic treatment of HYSYS, along with its refusal to

---

[96] Tr. Jury Instr. 10 (elements 2 and 3 of Fraud as Alleged Against PAA Natural Gas Storage); 5/16/24 Trial Tr. 228–29.

[97] Email to D. Noack to J. Goebel et al. re: PNG Inventory Verification; DX1674 (Email from M. Cline re. Project Hollywood — MIPA — Seller Disclosure Schedules); DX1672, at 4–5 (Ltr. to Hartree Partners, LP re. Project Hollywood Underwriting Call Agenda); 5/6/24 PM Trial Tr. 43, 50–58, 68, 76; 5/8/24 AM Trial Tr. 84, 148–49; 5/9/24 Trial Tr. 244; 5/14/24 AM Trial Tr. 111–12.

[98] *See, e.g.*, 5/14/24 AM Trial Tr. 84–86, 104–06, 115–17, 126; *see, e.g.*, 5/8/24 AM Trial Tr. 143–45.

[99] *See* 5/8/24 PM Trial Tr. 66–67; *see also* 5/14/24 AM Trial Tr. 69–70, 85; *see also* 5/15/24 Trial Tr. 22–23.

[100] *See* 5/8/24 AM Trial Tr. 120; *see also* 5/9/24 Trial Tr. 158–59; *see also* 5/14/24 AM Trial Tr. 84–86, 104–06, 126.

disclose actual HYSYS outputs and the known (and growing) historic discrepancies, demonstrates that PAA did intend for Hartree to rely on the inaccurate NGI base gas calculations.

Most telling of PAA's intent to deceive are its internal discussions about the discrepancy and its "kick the can" solution to any facility issues; those demonstrate that its concealment was a deliberate attempt to cause Hartree to rely on the false 4.20(a) representation.[101]

### 3. PAA had the actual intent to receive a material benefit.

Due to PAA's misrepresentation, Hartree paid for of gas that it did not receive and PAA materially benefitted from something that it didn't have physical possession and custody of at the time of the MIPA transfer.[102]

In the MIPA, PAA represented that there was *at least* 18,759,416 MMBtu of Base Gas at the relevant times.[103] This just wasn't true and PAA knew it. Hartree proved by a preponderance of the evidence that PAA had the actual intent to receive a material benefit—payment for a certain amount of gas that wasn't transferred, as well as all else that went along with the actual closing of the deal itself.

---

[101] 5/6/24 PM Trial Tr. 99–101; PX18, at 3 (Mr. Noack identifies "potential meter error" as a source of the NGI–HYSYS discrepancy and decides to "Park ~ 3Bcf to Oct 2020"); *see Maverick Therapeutics*, 2020 WL 1655948, at *27 (finding defendant's silence was "telling" when it was clear plaintiff's decision was induced by misunderstood contract concepts).

[102] *See* 5/13/24 AM Trial Tr. 26; *see also* 5/14/24 PM Trial Tr. 8–9.

[103] MIPA, at §§ 2.2, 4.20(a).

In sum, Hartree has met its burden of proving that PAA knowingly committed fraud through its misrepresentations in MIPA Section and Schedule 4.20.

## B. HARTREE HASN'T MET ITS BURDEN OF PROVING THAT PAA COMMITTED FRAUD UNDER SECTION 4.12.

Hartree had the same burden—*i.e.* proving by a preponderance of the evidence—that PAA had actual knowledge that, on the MIPA Execution Date, its representation about federal compliance was actually and materially breached.[104] To the Court, Hartree hasn't met that burden.

Hartree simply states that PAA was not in compliance with *all applicable laws* including the regulations of the Federal Energy Regulatory Commission ("FERC") because gas was missing.[105] During trial, any references to compliance reports were vague, overbroad, conclusory, or unsubstantiated.[106] There was no evidence of any

---

[104] *See* Tr. Jury Instr. 10–11 (Fraud as Alleged Against PAA Natural Gas Storage); *id.* 40 (query on Section 4.12 allegation).

[105] Hartree's Post–Trial Opening Br. 43–44.

[106] *See*, *e.g.*, 5/7/24 PM Trial Tr. 13–17 ("I'm referring to every semiannual inventory verification report that was filed by PNG during your tenure at PNG"); 5/8/24 AM Trial Tr. 75 ("Q. Do you know, sir, that for several years, several years in FERC filings made by Plains Natural Gas, the inventory that Plains provided the FERC was based on HYSYS? Do you know that? A. So the answer I gave you yesterday on that is I was unaware of that until one of your attorneys mentioned that at some point in time in this process."); 5/10/24 Trial Tr. 18 ("Q. Got it. So you're not personally aware of any other prior discussions with FERC regarding an issue — A. That is correct."); 5/9/24 Trial Tr. 10 ("Q. Here's what I want to know: When you were meeting with the Hartree folks, were you part of any discussions where Hartree partners engaged inactive deception against the FERC and against their banks about these caverns and wanting to buy trading gas so that they could make money, but have someone else pay for it. Were you a part of those discussions? A. I never — was never involved in any discussions like that. I never saw any evidence of that."); 5/15/24 Trial Tr. 303 ("Q. Have you ever lied to FERC? A. Definitely not."); 5/16/24 Trial Tr. 152 ("Q. You're aware that a discrepancy between Hysys and NGI is a problem

administrative or official finding of non-compliance nor anything but bald nebulous party assertions thereon. This, the Court finds, doesn't satisfy Hartree's burden of proof to support a verdict on its Section 4.12 allegation.[107]

The Court also declines to engage in whether PAA violated any compliance laws or federal regulations because Hartree asked for no damages under Section 4.12 and presented no evidence as to any amount of damages it should be entitled to due to any potential non-compliance.[108] The only damages requested by Hartree were for the cost of the replacement gas.[109]

Accordingly, this Court does not find in favor of Hartree in its claim of fraud under Section 4.12 nor, hereafter, award damages for this specific claim.

## C. PAA IS LIABLE FOR $30,247,277.60 IN DAMAGES.

Just like any other element, "[p]laintiffs must prove their damages by a preponderance of the evidence."[110] And "[p]roof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence,

---

for FERC reporting; right? A. No, I'm not aware of that.").

[107] *See Eskridge v. Hutchins*, 2017 WL 1076726, at *2 (Del. Super. Ct. Mar. 22, 2017) (citing *Spence v. Funk*, 396 A.2d 967, 978 (Del. 1978)); 5/14/24 AM Trial Tr. 69 ("We relied on the fact that they were in compliance with all laws."), 87.

[108] Hartree's Post–Trial Opening Br. 47–50.

[109] *Id.*; *see* Compl. ¶ 57; *see also* 5/13/24 AM Trial Tr. 27; 5/14/24 PM Trial Tr. 37–38.

[110] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (citing *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *22 (Del. Ch. Jan. 29, 2010)), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.,* 11 A.3d 749 (Del. 2010); *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013).

when compared to the evidence opposed to it, has the more convincing force and makes [one] believe that something is more likely true than not."[111]

Delaware doesn't "require certainty in the award of damages where a wrong has been proven and injury established."[112]  Indeed, "[t]he quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage."[113]  "Responsible estimates of damages that lack mathematical certainty are permissible so long as the factfinder has a basis to make such a responsible estimate."[114]

Delaware courts demonstrate a general willingness to make a wrongdoer "bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven."[115]  When the extent of damages is made more difficult to ascertain by the nature of the wrongful act itself, "it would be a perversion of fundamental principles of justice to deny" reasonable and adequate relief "to the

---

[111] *Grand Acquisition, LLC v. Passco Indian Springs DST*, 145 A.3d 990, 994 (Del. Ch. 2016) (internal quotations omitted).

[112] *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (quoting *Red Sail Easter Ltd. Partner, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).

[113] *Total Care Physicians, P.A. v. O'Hara*, 2003 WL 21733023, at *3 (Del. Super. Ct. July 10, 2003).

[114] *Beard Research*, 8 A.3d at 613.

[115] *Great Am. Opportunities*, 2010 WL 338219, at *23 (citing *Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023 (Del. 2001)); *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 855 A.2d 1059, 1067 (Del. Ch. 2003); *Dionisi v. DeCampli*, 1995 WL 398536, at *18 (Del. Ch. June 28, 1995)).

injured person and thereby relieve the wrongdoer from making any amend for his act."[116]

In determining the compensatory damages due to Hartree, the Court is guided by these principles just explained and credits the testimony and evidence that speaks to the *amount* of gas that wasn't "in place" and transferred at the relevant times in June and August 2021, when it contracted for and took over Pine Prairie. But the Court finds the testimony and evidence of just how much Hartree was *required* to *spend* to make itself whole less credible. The Court finds that Hartree's supposed outlay for the replacement gas was, in no small part, a product of its own chosen timing and sourcing of the natural gas it obtained. Later events create greater dubiousness in that pricing and Hartree's actual loss. Thus, the Court returns a far more reliable compensatory damages award based on the price of the asset not transferred and the only other expense supported by credible evidence. For the gas not transferred, the Court uses the then-existing market rate that Hartree would have had to pay had it been immediately aware of its loss, without application of the MIPA-based discount. Here, Hartree's demand for $55,084,290 is meant to afford it the "benefit of the bargain," *i.e.* putting it "in the same financial position that [it] would have been in if [PAA]'s representations had been true."[117] To Hartree, that is

---

[116] *Total Care Physicians*, 2003 WL 21733023, at *3.

[117] Hartree's Post–Trial Opening Br. 47.

properly done using the cost of replacement gas at a significantly increased price compared to the price at the time of the contract's execution.

Hartree controlled the time it purchased the replacement gas, and it chose to purchase at a much higher price from its parent company. In presenting its evidence on loss, Hartree disclosed that its parent company controlled the deal's terms and executed the deal on behalf of itself.[118] Hartree's parent company purchased futures contracts for volumes in January, February, July, and August of 2023.[119]

Regardless of whether the loss was passed on to another entity, Hartree sufficiently proved some level of damages. It would be neither in the interest of justice nor consistent with Delaware public policy to hold that Hartree suffered no damages simply because it took certain actions to remedy its loss from PAA's misrepresentations.[120] But this Court will not award Hartree any additional damages based on the increased price of the replacement gas at the time of its actual "purchase" when Hartree's parent company made the purchases at its own pace and on terms it unilaterally decided. That the Court finds would be neither reasonable

---

[118] *See* RWI Deals; *see also* 5/10/25 Trial Tr. 264–65 (highlighting the testimony of Mr. Lemme, an employee for the parent company, who purchased the replacement gas).

[119] 5/10/24 Trial Tr. 109–10. The Court does take into consideration on this specific damages issue that there is no evidence that Hartree ever looked at other suppliers or chose its purchase price strategically. *See* 5/10/24 Trial Tr. 109–10, 264–65; *see also* 5/13/24 AM Trial Tr. 27.

[120] *See*, *e.g.*, *Total Care Physicians*, 2003 WL 21733023, at *3 (finding that there should be accountability for actions even if damages are not proven to a certainty).

nor justifiable.[121]

Accordingly, the Court bases its damages' calculation on the value of the missing gas at the time the fraud occurred.[122] Even though the MIPA had a locked base price of $2.90 per MMBtu, the Court sees it fit to calculate damages based on what Hartree would have spent if it had immediately noticed and replaced the missing gas, which would have been for $3.84 per MMBtu.[123] This most accurately represents the actual loss—that is, the price of gas at the time the fraud occurred. So, the base price the Court will use for its damages calculation is $3.84 per MMBtu.

- 7.295 BCF[124] x 1,037,000 MMBtu = 7,564,915 Missing MMBtu.
- 7,564,915 MMBtu x $3.84 = $29,049,273.60—Market Value at
  the Time of Fraud.

The market value of the replacement gas at the time of the fraud was $29,049,273.60.

Because Hartree used water to stabilize cavern volume until the replacement gas was secured, the Court also finds it appropriate to add the water injection costs of $1,198,004.[125]

---

[121] *See Red Sail*, 1992 WL 251380, at *7 ("Each situation must be evaluated to know whether justice will permit an estimation of damages given the testimonial record or whether the record affords insufficient basis to fix an award.").

[122] *See*, *e.g.*, *Maverick Therapeutics*, 2021 WL 1592473, at *11 (basing its damages calculation on the value represented and the value actually received at the time of the fraud).

[123] DX1704, at 1; Email from S. Levy re: Plains Debt Financing Update, at 1.

[124] Hartree proved, by a preponderance of the evidence, that the use of 7.295 Bcfs of gas most properly reflects what was missing when Pine Prarie was transferred into its possession.

[125] Ct. Ex. 3, at 1; 5/15/24 Trial Tr. 165; 5/16/24 Trial Tr. 276 (requesting $56,282,294 in damages at closing which equal $55,084,290 on replacement gas plus $1,198,004 on replacement water).

- $29,049,273.60 + $1,198,004 = $30,247,277.60$ in Total Damages.

The Court may have been inclined to include additional costs associated with the post-acquisition investigation of the Pine Prairie facility, but there is insufficient evidence allowing the Court to reliably calculate such costs.[126]

Accordingly, the Court awards Hartree $30,247,277.60 in damages—*i.e.*, the value of the "MMBtu of Base Gas" that Pine Prairie did not have "physical possession and custody of" upon closing/transfer and the cost of the temporary water-fix needed to ensure pressure support while that was sorted out.

## V. CONCLUSION AND VERDICT

In 2021, Hartree and PAA entered into the MIPA for the sale of two facilities and their gas. Regarding the Pine Prairie facility, Hartree asserted two claims of fraud: (1) that the actual quantity of "base gas" was significantly less than represented in the MIPA, and (2) that PAA falsely stated in the MIPA that it was in full regulatory compliance.

Following a nine-day trial, the Court now finds in favor of Hartree on its fraud claim concerning Section and Schedule 4.20(a) "Base Gas"/"Gas in Place" misrepresentation. Hartree did not receive the MMBtu amount it paid for due to PAA's misconduct and PAA was compensated for base gas it did not possess and

---

[126] *See* Hartree's Post–Trial Opening Br. 47–50 (arguing for damages only from the purchase of replacement gas and no other expenses that may have been incurred).

transfer at closing.

But the Court doesn't find that PAA falsely represented that it was in regulatory compliance. And, even if it did, any such finding wouldn't affect the damages calculation because Hartree neither requested nor proved any damages therefor.

Accordingly, the Court awards Hartree a total of $30,247,277.60 in damages.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*
_____
Paul R. Wallace, Judge